United States District Court
Middle District of Florida
Jacksonville Division

**TAMMY LORRAINE FIELDS,**

 *Plaintiff,*

v.                NO. 3:16-CV-698-J-PDB

**COMMISSIONER OF SOCIAL SECURITY,**

 *Defendant.*

---

# Order Affirming Commissioner's Decision

This is a case under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security denying Tammy Fields's claim for disability insurance benefits.[1] She seeks reversal, Doc. 15; the Commissioner, affirmance, Doc. 16.

---

[1] The Social Security Administration uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of their denial. *Bowen v. City of New York*, 476 U.S. 467, 471−72 (1986). A state agency acting under the Commissioner's authority makes an initial determination. 20 C.F.R. §§ 404.900−404.906. If dissatisfied with the initial determination, the claimant may ask for reconsideration. 20 C.F.R. §§ 404.907−404.918. If dissatisfied with the reconsideration determination, the claimant may ask for a hearing before an Administrative Law Judge ("ALJ"). 20 C.F.R. §§ 404.929−404.943. If dissatisfied with the ALJ's decision, the claimant may ask for review by the Appeals Council. 20 C.F.R. §§ 404.967−404.982. If the Appeals Council denies review, the claimant may file an action in federal district court. 20 C.F.R. § 404.981. Title 42 U.S.C. § 405(g) provides the basis for the court's jurisdiction.

The Commissioner substantially revised the regulations on the consideration of medical evidence for claims filed on or after March 27, 2017. *See* 82 Fed. Reg. 5844-01, 5844 (Jan. 18, 2017). Because Fields filed her claim before that date, all citations

I.   **Issues**

Fields presents two issues: (1) whether substantial evidence supports the Administrative Law Judge's ("ALJ's") evaluation of her treatment records and the opinions of treating physician Dr. Luiz Massa; and (2) whether substantial evidence supports the hypothetical he presented to the vocational expert ("VE"). Doc. 15 at 10–12.

II.   **Background**

Fields was born in 1963 and last worked in October 2012. Tr. 155, 190. She has experience as a data-entry specialist. Tr. 190–91. She alleges she became disabled in October 2012 from arthritis; asthma; anxiety; depression; a back injury; tail bone, hip, and neck pain; carpal tunnel syndrome; and bone spurs in her back, neck, and tail bone. Tr. 189. She is insured through 2017.[2] Tr. 182. She proceeded through the administrative process, failing at each level. Tr. 1–7, 8–31, 72–100, 104–09. This case followed. Doc. 1.

III.   **Evidence**

This order adopts the summaries of facts in the ALJ's decision, Tr. 16–22, and the parties' briefs, Doc. 15 at 3–8; Doc. 16 at 2–3. Some of the evidence is set forth in more detail here.

In April 2014, kinesiotherapist[3] Greg Kelly completed a functional capacity evaluation of Fields. Tr. 842–44. He indicated Fields cannot perform even sedentary

---

are to the regulations in effect on the date of the ALJ's decision unless otherwise stated.

[2]The ALJ states Fields is insured through 2016. Tr. 11, 13. Earnings records appear to indicate Fields is insured through 2017. *See* Tr. 157, 166, 168, 182. Fields does not raise this as an issue, and it does not appear to matter to the outcome.

[3]Following the evaluator's name is the abbreviation "KT," which likely stands for "kinesiotherapist." *See* United Spinal Ass'n, *Alphabetical Listing of Medical*

activity, defined as "Exerting up to 10 lbs. of force occasionally. Frequent and constant negligible." Tr. 842. He noted that, on a scale of 0 to 10—with 0 being no pain, 1 to 3 indicating mild pain, 4 to 6 indicating moderate pain, 7 to 9 indicating intense pain, and 10 indicating an emergency—Fields reported pre- and post-testing pain levels of 7, her lowest pain level was a 2, and her worst pain was an 8. Tr. 843. Grip-strength testing showed a 27-percent strength deficit in her right hand and a 14-percent deficit in her left. Tr. 843. He opined she should avoid floor-to-knuckle, 12-inch-to-knuckle, and shoulder-to-overhead lifting; bending; squatting; kneeling; crawling; twisting; climbing stairs or ladders; and driving a standard-transmission car. Tr. 844. He opined she could occasionally carry and lift negligible weight from knuckle to shoulder height, occasionally push and pull 1 to 10 force pounds, occasionally stoop, and frequently reach. Tr. 844. He opined she could perform gross and fine hand and foot movement. Tr. 844. He opined she could sit for for 45 minutes at a time, and 3 to 4 hours total; stand for 30 minutes at a time, and 1 to 2 hours total; walk for 15 minutes at a time, and 0 to 1 hour total; and drive an automatic-transmission car for 30 minutes at a time, and 0 to 1 hours total. Tr. 844.

In a section titled "Summary," Kelly stated:

> Ms. Fields indicated multiple areas of pain to be the neck, bilateral shoulders arms, hands, low back, bilateral hips, bilateral lower extremities, feet, and reports global fibromyalgia pain symptoms, with present intense pain rating of 7. She presented at time of testing, ambulating with assistance of straight cane, due to reported history of previous falls with lower leg giveaway. She was observed demonstrating guarding and bracing of the back with intermittent changes of position from sitting to standing throughout testing for reported disruption of pain symptoms. The lowest level of pain experienced in the last 30 days is mild pain rating of 5 [sic], with use of medication, and minimizing or avoiding activities of daily living that result in aggravation, or increase of pain symptoms. She claims intense pain level of 8 as the highest level of pain experienced in the last 30 days with increased functional activities of daily living, due to spouses medical conditions,

---

*Abbreviations*, available at http://www.spinalcord.org/resource-center/askus/index.php?pg=kb.page&id=1413 (last visited Aug. 24, 2017).

3

> undetermined causes associated with onset of increase pain severity, or changes in weather conditions. Despite moderate to intense pain rating, the client was able to demonstrate a consistency of performance during testing, with no overt findings for inappropriate pain focus on pain assessment questionnaires, observation, and testing, for abnormal pain symptoms. Maximal and 5-position isometric hand grip test revealed bilateral hand grip weakness as compared to normal age group mean handgrip values, with limitations due to reported maximal efforts, with bilateral hand pain. Testing resulted in mostly expected bell shaped curvature of the left hand, and reproducibility of values with bilateral hand grip, suggestive of consistent effort. Functional testing revealed tolerance to negligible levels of effort and repetitions of material and non-material handling activities, suggestive of limitations with ability to safely perform components of even the Sedentary Duty Physical Demand Level. She would also be limited with ability to participate with sustained or frequent basis, due to her poor tolerance for prolonged periods of sitting, standing and walking, from her claims of requiring intermittent supportive positional lying down, totaling 2-3 hrs., to assist with management of progressive elevation of pain symptoms throughout the day. She would also be limited due to reported 3-4 episodic pain flare-up a month resulting in 6-8 days of incapacitating pain severity. The client also indicated minimizing or avoiding driving due to pain and physical limitations. Please refer to functional testing for specific guidelines, capabilities, or limitations.

Tr. 842 (errors in original). Other comments are difficult to read but appear to largely track the statements in the summary. *See* Tr. 843–44. Under a section titled "Musculoskeletal Screen (Comments)," Kelly stated:

> A brief musculoskeletal evaluation was performed with observation of functional mobility during testing for consistency of effort. Testing revealed cervical ROM limitations near end ranges with cervical rotation and lateral bending. She also demonstrate[d] limitations and guarded functional movements of the low back in all planes of movement and inability to perform or complete forward bending, squatting or kneeling due to her reported pain areas of the hips, knees, low back, lower extremity weakness, and loss of balance.

Tr. 843. He did not perform an endurance test but noted her heart rate during "limited functional testing was suggestive of no overt de-conditioning." Tr. 843. In June 2014, Dr. Massa signed the evaluation above a line labeled "Physicians Authorization Signature." Tr. 842.

4

In July 2014, Dr. Massa completed a physical medical source statement. Tr. 838–41. He stated he sees Fields about one to two times a month. Tr. 838. He noted her symptoms include pain in her neck, arms, hands, low back, hips, legs, and feet, and she reports "global fibromyalgia." Tr. 838. He explained a January 2014 x-ray shows "minimal" disc degeneration at C4/C5; she has a slight osteophyte in her hips; she had tenderness at the trochanteric bursa (fluid sac between the greater trochanter (bony protrusion) of the femur and the skin, *see* STEDMAN'S MEDICAL DICTIONARY 222, 1639 (William R. Hensyl et al. eds., 25th ed. 1990)) and at 14 of 18 tenderness points; she reports relief with trochanteric bursa injections; her low-back pain increases with extension; she experiences paraspinal spasms; and she has tenderness at the sacroiliac joint. Tr. 838.

Dr. Massa opined Fields could walk 5 blocks without rest or severe pain; sit for 20 minutes at a time and about 2 hours total; and stand for 20 minutes at a time and about 2 hours total. Tr. 839. He opined she would need to be able to shift positions at will from standing, sitting or walking and would need to walk around periodically during a workday. Tr. 839. He opined that, due to muscle weakness, chronic fatigue, pain/parethesias, numbness, and adverse medication effects, she would need to take unscheduled breaks about every 20 minutes for about 2 to 5 minutes at a time to stretch. Tr. 839. He opined she must use a cane or other handheld assistive device due to imbalance. Tr. 840. He opined she could never lift 10 pounds and could rarely twist, stoop, crouch, climb stairs, and climb ladders. Tr. 840. He opined she could use her hands for gross and fine manipulation for 100 percent of an 8-hour workday but could only reach in front of her body or overhead between 34 and 66 percent of a workday. Tr. 840. He opined she would be off-task for about 20 percent of a workday but would be capable of low-stress work. Tr. 840. He opined she would have good days and bad days and would likely miss more than four days of work a month from her impairments or treatment. Tr. 840.

At a 2014 hearing, Fields testified as follows.

5

She lives in a house with her husband, her 17-year-old daughter, a cat, and five dogs. Tr. 40. She has a driver's license but usually only drives two to three times a week to go to doctor's appointments, church, the grocery store, and the drug store. Tr. 41. She attended school through the 12th grade but received a GED. Tr. 42. She has never received vocational training or attended college. Tr. 42. She stopped working in October 2012 because she "could no longer do the amount of work that was expected" due to pain in her hands, shoulders, and back and spasms. Tr. 42–43. She worked as a data entry specialist. Tr. 43. She spent most of her workdays sitting. Tr. 44–47. The heaviest item she had to lift was a 45- to 50-pound file box, which she had to move monthly. Tr. 44–45.

She cannot work because she is in severe pain due to fibromyalgia. Tr. 48. She also has pain in her hips and tail bone from falling. Tr. 48. She has experienced pain "for years" but did not know what was wrong until recently. Tr. 48–49. She takes Lyrica and Percocet, which help but do not eliminate pain. Tr. 49–50. On an average day, her pain is an 8 on a scale of 1 to 10. Tr. 49–50. Stress exacerbates pain, and sleep helps relieve it. Tr. 50. She attends physical therapy, which also helps. Tr. 50–51. Asthma, anxiety, and depression also prevent her from working. Tr. 51. She has had asthma since she was in a car accident when she was 18, but using a nebulizer and inhaler help. Tr. 52–53. She has had depression "all [her] life," but medication helps. Tr. 53. Even with medication, her depression and anxiety prevent her from leaving her house most of the time; if she gets out of her routine, she "get[s] real shaky" and cannot be around crowds. Tr. 53. She experiences some side effects from medication, but they do not bother her. Tr. 54.

She can sit for 10 to 15 minutes before she needs to stand, and she can stand for only 10 or 15 minutes. Tr. 54–55. She can walk only about 30 feet due to instability arising from her hip, tailbone, and lumbar pain. Tr. 55–56. She has used a cane since she applied for disability benefits, but not one prescribed it to her; she uses it because she feels unstable. Tr. 55. She cannot lift more than 5 or 10 pounds. Tr. 56. She gets

6

along well with others. Tr. 56. It takes her "a little while to comprehend things," and she has trouble following longer conversations. Tr. 56. She has always had that difficulty. Tr. 56. She can "sometimes" follow the storyline of a 30-minute television show. Tr. 56–57. Her memory is "getting worse," but she remembers to take medication daily. Tr. 57.

In a typical day, her feet hurt as soon as she wakes up. Tr. 57. She makes a pot of coffee, sits down, and reads daily scriptures. Tr. 57. She goes outside to feed her dogs but must hold onto things to keep from falling. Tr. 57. She comes back inside, watches television, and makes food for herself. Tr. 57. She then takes a nap because her body "shuts down." Tr. 57. She usually cooks easy meals, and her daughter helps with cooking. Tr. 58. She does not cut things like potatoes or onions because she is afraid she will cut herself. Tr. 58. Her husband and daughter help with cleaning and laundry. Tr. 58. She goes grocery shopping by holding onto the shopping cart, and it is "a lot on" her. Tr. 58. She has no hobbies. Tr. 58. Her family comes from Lakeland, Florida, to visit her. Tr. 59. She has few friends but will occasionally go to neighbors' houses "around the corner." Tr. 59. She does not use a computer and uses her phone only to call her husband and text her children. Tr. 59. She attends church weekly but is not involved with church activities. Tr. 59. She and her husband occasionally go out for dinner. Tr. 59. She performs physical therapy exercises on her bed but does nothing else to exercise. Tr. 60. She will sometimes play with and talk to her dogs outside. Tr. 60.

Her pain began when she fell in 2010 or 2011. Tr. 61. She has fallen "maybe four" times. Tr. 61. Dr. Massa said using the cane was "fine." Tr. 61–62. She has to lie down or recline many times throughout the day. Tr. 63. Her body typically "shuts down" at around 2:00 p.m., at which point she must lie in bed. Tr. 63.

The ALJ asked a VE to consider a hypothetical person with Fields's work history who could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; could sit for up to 6 hours, stand for up to 6 hours, and walk for up to 6

7

hours; could occasionally use hand and food controls; could occasionally reach overhead; could frequently handle, finger, and feel; could occasionally climb ramps and stairs; could not climb ladders or scaffolds; could frequently balance, stoop, and crouch; could occasionally kneel; could never crawl; should not work around unprotected heights or moving mechanical parts; should avoid concentrated exposure to humidity, wetness, dust, fumes, and gases; should avoid temperature extremes; could perform simple tasks with simple work-related decision-making; should have no more than occasional interaction with supervisors, coworkers, and the public; and whose time off-task would be accommodated by normal breaks. Tr. 66. The VE responded that person could not perform Fields's past work but could perform jobs such as bench assembler, electronics worker, and inspector. Tr. 66–67.

The ALJ asked the VE to consider a hypothetical person with the same limitations but who would need a sit/stand option allowing her to change positions at least every 30 minutes for a brief (3- to 4-minute) period of time. Tr. 67–68. The VE responded all three of the jobs would be available but reduced by about 75 percent. Tr. 68. The VE testified that, as reduced, there are 720 bench assembler jobs in Florida and 21,000 in the United States; 450 electronics worker jobs in Florida and 9700 in the United States; and 3500 inspector and hand packager jobs in Florida and 81,000 in the United States. Tr. 68.

The ALJ asked the VE to consider a hypothetical person with the same limitations as the second hypothetical but who could perform only sedentary work. Tr. 68. The VE responded that person could perform two jobs: document preparer (2300 in Florida; 98,000 in the United States) and file assembler (200 in Florida; 6600 in the United States). Tr. 68–69. The ALJ asked whether a hypothetical person with those limitations who also required frequent 20-minute breaks could perform competitive employment. Tr. 69. The VE responded no. Tr. 69.

Fields's counsel asked the VE to consider a hypothetical person with the same restrictions as the third hypothetical but who could rarely lift less than 10 pounds.

8

Tr. 70. The VE responded there would be no available jobs. Tr. 70. Counsel asked about the effect of being off-task for 20 percent or more of the workday. Tr. 70. The VE responded that "would eliminate competitive work." Tr. 70. The VE also testified an employee can be absent at most one day a month. Tr. 70.

## IV.  ALJ's Decision

At step one,[4] the ALJ found Fields has not engaged in substantial gainful activity since October 5, 2012. Tr. 13.

At step two, the ALJ found Fields suffers from severe impairments of cervical disc disease, lumbar disc disease, degenerative joint disease of the right hip, fibromyalgia, asthma, generalized anxiety, and depressive disorder. Tr. 13.

At step three, the ALJ found Fields has no impairment or combination of impairments that meets or medically equals the severity of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 14. He particularly considered listings 12.04 (affective disorders) and 12.06 (anxiety disorders). Tr. 14. He considered the "paragraph B"[5] criteria to determine if Fields's mental impairments meet or equal

---

[4]The Social Security Administration uses a five-step sequential process to decide if a person is disabled, asking whether (1) she is engaged in substantial gainful activity, (2) she has a severe impairment or combination of impairments, (3) the impairment meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, (4) she can perform any of her past relevant work given her residual functional capacity ("RFC"), and (5) there are a significant number of jobs in the national economy she can perform given her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4).

[5]The criteria in paragraph B are used to assess functional limitations imposed by medically determinable mental impairments. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(C). Paragraph B requires a disorder of medically documented persistence resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulty maintaining social functioning; (3) marked difficulty maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, App'x 1, §§ 12.04, 12.06.

9

the criteria of a listing. Tr. 14–15. He found Fields has a mild restriction in activities of daily living; moderate difficulties in social functioning; and moderate difficulties maintaining concentration, persistence, and pace; and has had no episode of decompensation of extended duration. Tr. 14–15. He also considered the "paragraph C"[6] criteria and found Fields does not meet them. Tr. 15.

After stating he had considered the entire record, the ALJ found Fields has the residual functional capacity ("RFC") to perform light work[7] as defined in 20 C.F.R. § 404.1567(b) with additional limitations:

> [T]he claimant can lift/carry 20 pounds occasionally, 10 pounds frequently. The claimant can sit, stand, and walk, each, for up to six hours. The claimant can push and pull as much as she can lift and carry. The claimant can occasionally use hand controls and perform occasional overhead reaching; the claimant can frequently perform handling, fingering, and feeling. The claimant can occasionally climb ramps and stairs. The claimant should never climb ladders or scaffolds. The claimant can frequently balance, stoop, and crouch. The claimant can occasionally kneel but never crawl. The claimant should not work around heights or moving mechanical parts. The claimant should avoid concentrated exposure to humidity, wetness, gas, fumes, and dust. The claimant should avoid any environments where there are temperature extremes. The claimant is limited to simple tasks and simple work related decisions with no more than occasional interaction with supervisors, co-workers, and the public. Time off task would be accommodated by normal breaks. The claimant requires a sit or stand option which allows for a change of [position] at least every thirty [minutes,] and this is a brief positional [sic] lasting no more than three to four minutes at a time.

---

[6]Paragraph C lists additional functional criteria for some listings. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(A).

[7]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. " 20 C.F.R. § 404.1567(b).

10

Tr. 15.

The ALJ gave "little weight" to the April 2014 functional capacity evaluation Dr. Massa signed, observing (1) reports of hand weakness were inconsistent with records of her performance at a physical therapist's office; (2) the person who conducted the testing and initially rendered the opinions was not an acceptable medical source; (3) Dr. Massa simply "signed off" on the report; (4) the examiner "was not an independent source" but was associated with the Institute of Pain Management; (5) the examination "was not a true functional capacity examination"; and (6) the opinions were "based in large part on minimal objective findings and copious subjective complaints." Tr. 20. He also gave little weight to Dr. Massa's July 2014 physical medical source statement to the extent it conflicted with the RFC, observing (1) Dr. Massa opined Fields needed a cane but noted he did not prescribe one; and (2) the limitations are "based almost exclusively on the claimant's subjective complaints, as the statement itself acknowledges minimal degenerative changes." Tr. 20.

The ALJ gave little weight to Fields's subjective complaints. Tr. 21. He explained:

> [D]ue to the nature of the claimant's primary impairment of fibromyalgia, the lack of objective evidence, including mild imaging and the benign clinical findings cannot be the Agency's primary considerations, though they are certainly a factor in the analysis. Consistent with SSR 12-2p, the undersigned has considered all of the evidence in the case record, including the claimant's alleged daily activities, medications or other treatments used to alleviate symptoms, the nature and frequency of the person's attempts to obtain medical treatment for symptoms, and statements by other people about the person's symptoms.

Tr. 21. He then observed Fields has almost exclusively been treated with medication until she began physical therapy, which she reported provided "good relief." Tr. 21.

He observed other evidence in the record was inconsistent with her reports of limited activities of daily living. Tr. 22.[8]

At steps four and five, the ALJ found Fields cannot perform her past relevant work[9] but can perform jobs the vocational expert identified (bench assembler, electronics worker, and inspector/hand packager) and those jobs exist in significant numbers in the national economy. Tr. 22–24. He therefore found no disability. Tr. 24.

V.   **Standard of Review**

A court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports his findings. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial

---

[8]Social Security Ruling ("SSR") 12-2p, 2012 WL 3104869 (July 25, 2012), provides the framework for the Social Security Administration's evaluation of fibromyalgia. Under SSR 12-2p, once fibromyalgia is found to be a medically determinable impairment that could cause a claimant's symptoms, the Social Security Administration "then evaluate[s] the intensity and persistence of the person's pain or any other symptoms and determine[s] the extent to which the symptoms limit the person's capacity for work." *Id.* at *5. If objective evidence does not substantiate a claimant's subjective statements concerning symptoms caused by fibromyalgia, the Social Security Administration must "consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms." *Id.* In assessing the claimant's residual functional capacity, the Social Security Administration "will consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" *Id.* at *6.

Fields does not argue the ALJ failed to follow the standards in SSR 12-2p for evaluating fibromyalgia. *See generally* Doc. 15.

[9]"Past relevant work is work [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough … to learn to do it." 20 C.F.R. § 404.1560.

12

evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* A court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Id.* A court must affirm the ALJ's decision if substantial evidence supports it, even if the evidence preponderates against the factual findings. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

## VI. Analysis

### A. *Whether substantial evidence supports the ALJ's evaluation of opinion evidence*

Fields argues the ALJ erred in failing to give "proper weight" to her extensive medical records and Dr. Massa's findings and opinions. Doc. 15 at 10–11. She observes Dr. Massa's opinions show she would be unable to perform even sedentary work, and her "exhaustive medical records" and Kelly's functional capacity evaluation support Dr. Massa's opinions. Doc. 15 at 10–11. The Commissioner disagrees. Doc. 16 at 5–7.

Regardless of its source, the Social Security Administration "will evaluate every medical opinion" it receives. 20 C.F.R. § 404.1527(c). "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of … impairment(s), including … symptoms, diagnosis and prognosis, what [one] can still do despite impairment(s), and … physical or mental restrictions." 20 C.F.R. § 404.1527(a). Diagnoses alone do not establish functional limitations; the "mere existence" of an impairment does not reveal its effect on a claimant's ability to work or undermine RFC findings. *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005). Opinions on issues that are dispositive of a case, such as whether a claimant is disabled or able to work, are not medical opinions because they are opinions on issues reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1). An ALJ "must state with particularity the weight given to different medical opinions and the

13

reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).

The Social Security Administration generally will give more weight to the medical opinions of treating sources[10] because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2). An ALJ does not need to give more weight to a treating source's opinion if there is good cause to do otherwise and substantial evidence supports the good cause. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists if the evidence does not bolster the opinion, the evidence supports a contrary finding, or the opinion is conclusory or inconsistent with the treating source's own medical records. *Id.* at 1240–41.

Unless the Social Security Administration gives a treating source's opinion controlling weight, it will consider several factors to decide the weight to give a medical opinion: examining relationship, treatment relationship, supportability, consistency, specialization, and any other relevant factor. 20 C.F.R. § 404.1527(c). An ALJ need not explicitly address each factor. *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011). The Eleventh Circuit has emphasized, "The law is clear that, although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

---

[10]A treating source is a physician, psychologist, or other acceptable medical source who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the treatment or evaluation required for the medical condition. 20 C.F.R. § 404.1502.

14

An acceptable medical source is a licensed physician (a medical or osteopathic doctor), licensed or certified psychologist, licensed optometrist, licensed podiatrist, or qualified speech-language pathologist. 20 C.F.R. § 404.1513(a). An ALJ may also consider evidence from other sources not listed as acceptable medical sources, including nurse practitioners, therapists, social welfare personnel, and friends. 20 C.F.R. § 404.1513(d). That evidence may show the severity of an impairment and how it affects a claimant's ability to work but cannot establish the existence of a medically determinable impairment or constitute a "medical opinion" under the regulations. Social Security Ruling ("SSR") 06-03p, 2006 WL 2263437 (Aug. 9, 2006). Opinions from other sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." Id. The record "should reflect the consideration of opinions" from other sources, and the ALJ should explain the weight given to them "or otherwise ensure that the discussion of the evidence … allows a claimant or subsequent reviewer to follow [his] reasoning, when such opinions may have an effect on the outcome of the case." Id.

Fields asserts the ALJ erred in "ignoring the findings and opinions" of Dr. Massa and observes that, had the ALJ adopted the limitations Dr. Massa found in the July 2014 medical source statement, she would have been found disabled. Doc. 15 at 10–11. But she offers virtually no argument why substantial evidence does not support the ALJ's decision to reject them. At most, she contends her "exhaustive medical records" and Kelly's functional capacity evaluation support Dr. Massa's opinions. Doc. 15 at 11. In effect, she asks the Court to provide de novo review of the evidence, which is not the standard.

In any event, substantial evidence supports the ALJ's reasons for giving little weight to both the April 2014 evaluation and the July 2014 medical source statement.

As to the April 2014 evaluation—to the extent Fields challenges the ALJ's consideration of it—the ALJ accurately observed a non-acceptable medical source

15

completed the evaluation, *see* Tr. 842; 20 C.F.R. § 404.1513(a), (d), and Dr. Massey merely signed off on it in June and completed his own assessment a month later, *see* Tr. 841–42. Though the ALJ had to consider the non-acceptable medical source's opinions on the severity and effects of Fields's impairments, he was not required to give controlling weight to it. *See* SSR 06-03p, 2006 WL 2263437. He considered the opinions but gave them little weight for several reasons. He found the examination "was not a true functional capacity examination." Tr. 20. Substantial evidence supports that finding; the report, though mentioning some "limited" functional testing, includes virtually no test results besides grip-strength testing. *See* Tr. 842–44. Without those, it is impossible to judge the examiner's opinions against those findings or determine whether his opinions were based on testing. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.").

The ALJ also rejected the April 2014 evaluation as "based in large part on minimal objective findings and copious subjective complaints." Tr. 20. Substantial evidence supports that characterization; the report primarily references Fields's subjective reports and does not indicate which limitations, if any, are based on objective functional testing. *See* Tr. 842–44. Dr. Massa rejected the only limitation possibly arising from an objective test result (grip weakness). *See* Tr. 840 (finding Fields could use her hands for gross and fine manipulation for 100 percent of an 8-hour workday). The ALJ gave little weight to Fields's subjective complaints of symptoms, observing (1) her course of treatment had been "almost exclusively" medication until she recently began physical therapy, which she reported provided "good relief"; (2) she had not consistently sought treatment, as would be expected if her symptoms were as severe as alleged; and (3) her activities of daily living, including her involvement in caring for her dogs, were greater than she had indicated. Tr. 21–22. Fields does not challenge the ALJ's evaluation of her credibility.

The ALJ found the examiner was "not an independent source" because he was "associated with the Institute of Pain Management." Tr. 20. Though it is unclear what the ALJ meant by that statement or why that fact warrants giving less weight to the opinions, reversal and remand are unwarranted because the ALJ provided other good reasons for his decision, and Fields has not argued reliance on this reason was inappropriate or affected the ALJ's decision. *Cf. Shinseki v. Sanders,* 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

The ALJ similarly rejected Dr. Massa's July 2014 medical source statement because the limitations "appear to be based almost exclusively on [Fields]'s subjective complaints, as the statement itself acknowledges minimal degenerative changes." Tr. 20. Substantial evidence supports that characterization; the only objective evidence Dr. Massa references in the statement is (1) an x-ray showing "minimal" cervical disc degeneration and (2) a "slight" osteophyte. Tr. 838. The rest of the statement discusses only Fields's complaints of tenderness, pain, and unspecified medication side effects. *See* Tr. 838–41.

Fields points to no opinion from any other physician that she contends the ALJ should have considered but instead simply summarizes her records of treatment with them showing various diagnoses. *See* Doc. 15 at 3–8. The ALJ discussed or mentioned many of those records in his decision. *See* Tr. 16–19. Because diagnoses alone do not establish functional limitations and do not undermine an ALJ's decision, the "mere existence" of Fields's impairments does not reveal their effect on her ability to work or undermine the ALJ's RFC finding. *See Moore,* 405 F.3d at 1213 n.6. Regardless, even accepting that the records she cites could have supported giving more weight to Dr. Massa's opinions, Fields has failed to show substantial evidence does not support the ALJ's decision to give little weight to them. *See Martin v. Sullivan,* 894 F.2d 1520, 1529 (11th Cir. 1990) ("Even if the evidence preponderates against the … factual

17

findings, we must affirm if the decision reached is supported by substantial evidence.").

Substantial evidence supports the ALJ's evaluation of Dr. Massa's opinions and other evidence. Reversal and remand to reevaluate that evidence are unwarranted.

B.  *Whether substantial evidence supports the hypothetical the ALJ presented to the VE*

Fields argues the ALJ's decision "was predicated upon a flawed hypothetical" that did not include limitations Dr. Massa found. Doc. 15 at 11–12. The Commissioner responds substantial evidence supports "the ALJ's RFC finding and hypothetical questions derived from the RFC," and Fields has not identified any other error. Doc. 16 at 7–8.

At step five, an ALJ must decide whether a significant number of one or more jobs that the claimant can perform exist in the national economy. 20 C.F.R. § 404.1566(b). An ALJ may use a vocational expert's testimony for that determination. *Winschel*, 631 F.3d at 1180. For a vocational expert's testimony to be substantial evidence, the ALJ must pose a hypothetical question that includes all of the claimant's impairments. *Id.* An ALJ is "not required to include findings in the hypothetical that [she] had properly rejected as unsupported." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004).

Because substantial evidence supports the ALJ's decision to give little weight to Dr. Massa's opinions, he was not required to include limitations from those opinions in the RFC evaluation. The VE's testimony in response to a hypothetical mirroring that RFC provided substantial evidence for the ALJ's finding Fields could

perform available jobs. Reversal and remand based on an allegedly incomplete hypothetical are unwarranted.[11]

---

[11]Fields appears to take issue with several other aspects of the ALJ's decision. She developed no argument as to any of them. Rejection of them is warranted for that reason alone. *See* Doc. 12 ("The Court will deem waived any issue that the plaintiff does not raise or fully brief (i.e. provide more than just a summary contention) unless the interests of justice require its consideration."). In any event, none have merit.

Fields appears to suggest the ALJ reached a decision "as directed" by the grids. Doc. 15 at 1. The ALJ did not rely on the grids; instead, he observed that, if she could perform the full range of light work, the grids would compel a "not disabled" finding, but because she has additional limitations, he relied on VE testimony. Tr. 23.

Fields argues the ALJ stated her ability to perform light work was "impeded by additional limitations" but failed to identify or describe those limitations. Doc. 15 at 2. That argument fails; the ALJ provided a detailed RFC finding that included limitations restricting her to less than the full range of light work. Tr. 15.

Fields argues the ALJ did not address or reference any hand limitations. Doc. 15 at 2, 5. The ALJ noted Kelly's finding Fields had reduced grip strength but observed that finding was inconsistent with other medical records. Tr. 20. Moreover, Dr. Massa opined Fields could perform gross and fine manipulation for 100 percent of an 8-hour workday. Tr. 840. The ALJ implicitly adopted that finding. *See* Tr. 20 (giving little weight to Dr. Massa's opinions "that are not consistent with the [RFC].").

Fields argues the ALJ did not acknowledge her testimony that she is unable to sit for prolonged periods. Doc. 15 at 3. The ALJ stated he considered all of her testimony, *see* Tr. 20, but he implicitly rejected it in finding she could sit for up to 6 hours in an 8-hour workday but would require a sit/stand option allowing her to change positions every 30 minutes. Tr. 15.

Fields argues the ALJ did not assess her purported need for a cane. Doc. 15 at 7. The ALJ addressed and rejected that limitation, observing Fields admitted no doctor prescribed a cane, and she used it only when she subjectively believed she needed to. Tr. 20–21.

## VII. Conclusion

The Court **affirms** the Commissioner's decision and **directs** the clerk to enter judgment in favor of the Commissioner and close the file.

**Ordered** in Jacksonville, Florida, on September 14, 2017.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c: Counsel of Record